Opinion delivered June 8, 1887.

---

## No. 5334.

### HUGH BARRON v. THE STATE.

1. MURDER—EVIDENCE—CHARGE OF THE COURT.—Upon the joint trial of this appellant and W. F. B., for murder, the State, over the objection of appellant, was permitted to prove threats against the deceased and his family, made by W. F. B. in the absence of appellant—the court promising to limit and control the said evidence in the charge to the jury, which it failed to do. *Held*, that in this failure the trial court erred.

2. SAME.—See the opinion *in extenso* for a special instruction asked by the defendant, which, in view of the evidence in the case, should have been given.

APPEAL from the District Court of Gillespie. Tried below before the Hon. A. W. Moursund.

The appellant and W. F. Barron were jointly indicted and jointly tried for the murder of W. W. Walker, in Gillespie county, Texas, on the twenty-eighth day of December, 1885. The trial resulted in the acquittal of W. F. Barron and the conviction of the appellant of manslaughter, with a term of two years in the penitentiary assessed as punishment.

Mrs. S. E. Walker, the widow of the deceased, W. W. Walker, and the mother of John and William Walker, was the first witness for the State. She testified, in substance, that the residences of the Barrons and the Walkers were situated about one hun-

Statement of the case.

dred and seventy yards apart, on opposite sides of a spring branch, in Gillespie county. Late on the fatal evening, the witness's sons, John and William, rode up to the witness's yard fence, laughing and hallooing loudly. Witness stepped out of her door and told them to be quiet, as she saw Mr. Barron (W. F.) peeping around the corner of his house, and that he might construe their conduct as an affront to him. John exclaimed: "Hurrah for Mr. Barron!" Thereupon Mr. Barron came from behind his house, and said to witness's sons: "You dry that up, you G—d d—d sons of bitches!" Witness's son William replied: "I can't take that; come out and I will fight you a fair fist fight; I am entirely unarmed, and have not even a pocket knife." Barron replied: "Come on; that is what I want, and have been wanting for a long time. I will fight you a fair fist fight." William and John started towards Barron, and Barron advanced from the southwest corner of his house to meet them. He advanced as far as his yard gate, a distance of about twenty-five steps. When John and William reached a point about thirty steps from Barron, he, Barron, took one step out of his gate and opened fire on the boys with a pistol. After firing one shot, he stepped back inside his gate, leaving one foot on the gate sill, whence he continued to shoot.

When the witness's sons started to go to Barron's, her husband was at his wood pile. He got with the boys about the time they reached the branch. When the deceased reached a point about ten steps distant from Barron's gate, the defendant, Hugh Barron, ran up from behind the Barron fence and shot the deceased with a gun. At the time the deceased was shot, he was looking at W. F. Barron, holding up both hands. If he said anything, witness did not hear it, but he was doing nothing whatever when he was shot. Witness was then about one hundred and fifty yards distant from the parties. She went at once to her husband, and found him gasping for the last time. The ball entered the right eye and passed out at the back of his head. After the shooting was over, the two Barrons mounted their horses and fled.

Cross examined, the witness testified that she was examined as a witness on the trial of the defendant, in Blanco county, for the murder of her son, William Walker. If she testified on that trial that, when she first saw Hugh Barron, he was standing up inside of his yard a little to the right of the gate, and that he fired over the fence at that point, the witness did not remember it.

It was her recollection that she testified on that trial that she first saw Hugh when he rose up from behind the fence and fired. Witness looked from her husband to Hugh just as the latter shot, and knew that her husband had both hands up when he was shot. Witness denied that, since the trial of the defendant in Blanco county, she had learned that her testimony on that trial conflicted with the testimony of other witnesses, and that consequently she had changed her testimony to correspond with that of the other witnesses. If the witness's sons, John and William, were drinking when they rode up to the house, the witness did not know it. The Barrons and the witness's family were not on good terms at the time of the killing. The deceased did not throw a rock at Hugh Barron just before he was shot; nor did he throw a rock at anybody else; nor was a rock thrown by either of the Walkers during the difficulty. Mrs. Barron threw several stones at the Walkers during the difficulty, and was the only person who threw stones. Witness did not state that fact on the trial in Blanco county, because she was not asked a question to draw it out.

Witness's husband and sons were between twenty and forty steps distant from W. F. Barron when he began to shoot. They continued to advance during the shooting, and deceased had gained a point ten or twelve steps distant from the gate when he was shot. W. F. Barron shot from the inside and through the gate. He fired his shots at witness's son William, using a pistol. Hugh fired over the fence with a gun from the inside of the yard, and to the right of the gate. The yard fence ran along the ridge of the hill, and from the outside appeared to be about three feet high. Witness knew by report of a difficulty which occurred between her son William and W. F. Barron two or three years before the shooting. She was not present, and had no personal knowledge of that difficulty. She knew that William and Mr. Steuhler went to Barron's house, and that William returned, angry, to get a gun, which she prevented him from doing. Witness remembered also that some time ago her two sons and the Bundick boys went into Barron's field where Mr. Barron was, but she did know what occurred there. She also remembered the occasion on which her daughter Lou met Barron's daughter at the spring and shook her. She also remembered the row that occurred between herself and Mrs. Barron. Shortly after the little affair between the girls, Mrs. Barron began abusing witness and calling her hard names. One day, while so

abusing witness, Mrs. Barron started to the house to get a pistol, threatening to shoot witness. Witness thereupon crossed the fence at the spring branch and seized a rock. Witness's husband was with her on that occasion, but did not cross the fence nor say anything. Witness did not get over the fence before Mrs. Barron started to the house to get the pistol, nor did she think she so testified on the trial in Blanco county. Witness could not explain why she turned back after crossing the branch which ran between the two fences, but it was not because Mrs. Barron got the pistol and said that she would defend herself. Witness did not, on that occasion, curse Mrs. Barron and threaten to kill her or beat her death. Witness remembered the difficulty between her son John and Hugh Barron. John had a club and was talking about whipping Hugh, who was in his father's yard. If Hugh then said anything to John, witness did not hear him. She heard John singing : "Whoop 'em up, Hugh!" Witness took the club away from John, and prevented him from assaulting Hugh. Witness did not positively know whether Hugh sang a song of any kind or not, but she thought he did. She had no recollection of stating positively on the trial in Blanco that she did not hear Hugh sing. Witness remembered that on another occasion her son John, when drunk and carousing around the yard, seized a gun and pointed it towards Barron's house. Mr. Barron was not then at home, but witness saw Mrs. Barron and some of the children. Witness's son William was shot in the ankle, knee and shoulder in the difficulty which resulted in his father's death, and he died afterwards. Witness's daughter Lou went with witness to the deceased, after he was shot, but did not change the position of the deceased's body as it lay on the ground.

Miss Lou Walker, the next witness for the State, corroborated the testimony of her mother circumstantially and in detail, except that she said that the occasion of the difficulty between her brother John and Hugh Barron, when the former threatened to beat the latter with a club, was a vulgar song sung by Hugh in the hearing of the witness and her mother.

H. Lewis testified, for the State, that he was on the scene of Walker's death on the evening of the killing and before the body was removed. It lay about twelve paces from Barron's northwest gate. The body lay on the right side, the face inclined toward the ground, and the head resting on the right arm, the arm being extended with the hand above the head. The left

hand was resting on the left side of the face. The head lay toward the gate. The ball which produced death passed in at the right eye, and out at the back of the head. Some cartidges were found in Barron's yard, to the right of the gate going out. The true location of the line between the counties of Gillespie and Blanco had long been a matter of dispute. The survey of 1858 would place the houses of Barron and Walker in Gillespie, while that known as the Watson line would place them in Blanco county.

P. Nebgin testified that, until the location of the Watson line, the Barron place was recognized as being in Gillespie county. Judging from the county line as it passes his own place, the witness would say that the Barron place was in Gillespie county. Witness once claimed the Barron land, but discovered that it was vacant land. Mr. William Walker took up a pre-emption there, and his father, the deceased, soon took up another near it, and he and his son built a house together on the line between the two places. William Walker worked with witness for two years after he pre-empted his place. Walker commenced work on his place in the May preceding Barron's location on the place adjoining.

Ed. Steuhler was the next witness for the State. He testified that on one occasion he went with William Walker to where Mr. Barron, with his wagon, was at work. Walker said: "Mr. Barron, I forbid you working any more within my lines." Mr. Barron replied: "The same to you, Bill Walker." Walker then said: "You have no right to this land." Barron replied: "Bill Walker, you are an infernal liar!" Walker then told Barron that he would have to retract that epithet, and started toward him, and Barron struck him over the head with a quirt or whip. Walker again rushed at Barron and Barron drew and presented a pistol, and said: "Bill Walker, you leave here!" Witness caught and took Bill Walker off. About that time old man Walker appeared upon the scene, when Barron covered him with the pistol and told him to halt. Old man Walker said to Barron: "I have not come for a row, but for peace." Barron replied: "Well, all right. If peace is what you want, come on.' Witness and Bill Walker left old man Walker and Barron talking.

Cross examined, the witness stated that he was not on friendly terms with old man Barron. Witness once claimed the land occupied by Barron, and was angry with him about the way he

was treated about the land. The row between Barron and Bill Walker described by witness occurred on Barron's own place. Barron was then in his wagon in front of his tent. Bill Walker did not call Barron a liar before the latter struck him with the quirt. Barron drew his pistol from his bosom, and did not get it from the wagon seat. Walker did not curse Barron and say that he would get a gun and kill him. Witness went home with Walker. Walker did not go into the house and try to get a gun. Mrs. Walker did not prevent him from getting a gun. Witness was at Walker's house when John pointed Cloudt's Winchester rifle at Barron's house, and snapped it. The gun was not loaded. John was drunk, cutting up, and pointed the gun in many directions. He cursed old man Barron. Witness did not see Mr. Barron at that time, but saw Mrs. Barron in the yard.

Thomas Colbath testified, for the State, that he one day met old man Barron on the road, and had a short conversation with him, in the course of which the old man said that Bill Walker and Ed Steuhler came to his place, and that Bill Walker ordered him not to work on the land; that he then ordered Walker not to cut any more trees on the land; that he struck Walker with a quirt, drew his pistol and made him and Steuhler leave; that old man Walker soon came, when he covered him (old man Walker) with his pistol and ordered him to halt; that old man Walker disclaimed any hostile purpose, and said that he came to make peace; that he told old man Walker he wanted peace, and the two had a long friendly talk. He said, further, that old man Walker was a good man and easy to get along with, but that he could not get along with Bill Walker, and, "between you and me, if Bill Walker ever fools with me I will kill him." The defendant, Hugh Barron, objected to this evidence as against him, because he was not shown to be present and sanctioning the statement, and because no conspiracy between himself and W. F. Barron to kill the Walkers, or either of them, was shown to exist. The court overruled the objection.

Cross examined, the witness stated that he saw and talked with Bill Walker the morning after the killing. Bill Walker told him that he was the cause of the old man's death—that whisky brought the fight on. He said, further, that the old man was doing nothing but begging for peace when he was shot; that he, Bill, threw two rocks at Hugh Barron, but that no rocks were thrown by either old man Walker or John Walker; that he threw no rocks until after old man Barron commenced

to shoot; that he was stooping to pick up a rock when he was shot in the shoulder; that old man Barron called him a son of a bitch, which he could not stand.

A. C. Bundick was the next witness for the State. He testified that he and his brother Thomas went to the house of Barron on the day before the killing, for the purpose of buying the Barron place. Barron had just driven up in his wagon. Witness's brother and Hugh Barron went into the house, and while the old man was unharnessing, witness told him that he had come to buy his place if the patent could be procured and he could buy out Bill Walker. He said that it made no difference about Bill Walker; that he owned the place and would take three hundred dollars for it. Witness asked him if he would insure the issuance of the patent. He replied that he would not. Witness then told him that he would not buy. Mr. Barron replied that it made no difference; that the land was his and he intended to hold it, patent or no patent, or some one would be killed about it; that he had had several rows with the Walkers about it, and would have settled it long before, but could never get them far enough from home, and that if he ever did catch them out far enough he would have a settlement. (To this testimony Hugh Barron objected, as bearing upon his case. It was admitted upon the statement of the trial judge that its effect upon this trial would be controlled in the charge to the jury.) On his way to Walker's, with his brother Babe, on the evening of and just after the killing, witness met Hugh and old man Barron riding rapidly up the road, the latter having a pistol in his hand. Witness asked, as they passed, "what was up." Old man Barron replied: "H—ll is to pay;" and Hugh said: "We are leaving here." Witness had not then heard of the killing. The witness was not related to the Walkers, but his brother and one of the Walker girls had married each other since the killing.

Cross examined, the witness stated that he and his brother Babe went with John and Bill Walker to where old man Barron was alone. They went at the request of the Walkers, who said that they wanted witnesses as to what passed, as they had been told old man Barron had threatened to put them under a peace bond. The Walker boys cursed old man Barron, and threatened, if he would go outside the field, to whip him. Barron told the Walker boys not to enter the field. The Walkers cursed Barron because, they said, his wife and daughter had been talking about their father and mother. Barron and Hugh were going

towards old man Tom Smith's house when met by witness and his brother on the evening of the murder.  Witness went on to Walker's, and saw the dead body of old man Walker lying near Barron's gate.

Bright McClendon testified, for the State, that he was at Barron's place on the morning after the killing.  He saw some cartridge hulls in Barron's yard, and several stones which he thought had been thrown into the yard.  Those stones lay loose on the ground, and, witness thought, had been thrown there, because the yard was otherwise clean and bare, and had evidently been recently swept.  On the morning after the killing, William Walker told witness that he was the cause of his father's death; that whisky was to blame; that he got drunk and brought on the fight.  Old man Barron and Hugh had long been regarded as quiet, peaceable citizens.  Witness had never heard old man Barron swear an oath.

The State rested.

Mrs. Florence Barron was the first witness for the defense. She testified, in substance, that she was at home on the evening of the tragedy, and witnessed all the incidents connected with it.  W. F. Barron got home late on that evening with the carcass of a hog, which he placed on a scaffold in the rear of the house, to cut up.  While engaged in that work, and, while his son Hugh was engaged in the house repairing an old chair, the two Walker boys, John and William, rode up towards the Walker house from towards Johnson City.  They came up cursing and hallooing.  They went into their house, but soon came out, cursing Mr. Barron, calling him a son of a b——h, saying they would kill him, and then they started towards Mr. Barron's house.  Witness said to Mr. Barron: "You will have to fight this time or run, for they are coming for a row."  Mr. Barron replied: "Well, let them come on, if they think I am afraid of them, or that they can run over me; I am ready for them." Witness and her husband were then at the southwest corner of the house, where Mr. Barron was working at his meat.  Mr. Barron then walked around the house towards the gate, on the line of the Walkers' approach.  Witness went around the east side of the house, and about that time her son Hugh came out of the house with a gun.  He went around the northeast corner of the house to the fence, a little northwest of the gate, where his father was.  Witness followed, and stopped near her son. Just before Mr. Barron reached the gate, he called to the

Walkers, the old man Walker being by that time one of the party and in advance, not to come any nearer to the house. The three Walkers then commenced picking up and throwing rocks at Mr. Barron and Hugh. Old man Walker threw the first stone, striking Hugh a severe blow on the thigh. Mr. Barron then opened fire on William Walker with a pistol, and Hugh shot old man Walker. Old man Walker was within five or six steps of the gate when he was shot. The advance of the Walkers did not stop until the old man was shot. William Walker then went towards the spring, and John ran off home.

This witness declared most positively that old man Walker was not pleading for peace, with his hands raised, but was advancing and throwing stones when he was shot. None of the Walkers proposed a fair fist fight, nor did Mr. Barron accept such a challenge. Barron had not sworn an oath in the hearing of the witness in fourteen years. He did not curse the Walkers on this occasion, nor did he call them sons of bitches. As they advanced toward the house, the Walker boys cursed Mr. Barron, calling him a son of a bitch, and saying that they would kill him. Old man Walker joined his boys at the branch. After the shooting, Mr. Barron and Hugh left on their horses. Mr. Barron caught his horse, but Hugh's horse was caught for him by his sister Mary, he being too much lamed by the blow of the stone inflicted by the deceased to catch the animal. As Mr. Barron and Hugh rode off, old lady Walker called to them: "Oh, you can leave, you sons of bitches, but we'll have revenge on your family—they shall die!" Witness and her daughter Mary then salted down the hog meat, and witness and her children made their way to a thicket, where they lay concealed until night, and then went to the house of Mr. Barron's brother. They were afraid of the Walkers. Before leaving her house, the witness saw a number of stones, as large and larger than a man's fist, lying in her yard. They were not there before the fight. The witness denied positively that she threw any stones during the fight.

On one occasion, prior to the killing, William Walker and Ed. Steuhler came to Barron's place just as Mr. Barron got home in his wagon from Mr. Thompson's. William Walker told Barron that he had come to forbid him doing any more work on the land, and from using water from the spring. Barron replied: "And Mr. Bill Walker, I forbid you from cutting any more timber inside of my lines. All I ask of you is to keep off my land

and let me alone." Walker replied: "From your actions, you would steal an unmarked hog or yearling." Barron said: "You are a liar!" and changed his position from the seat to the bed of the wagon. A few more words passed, when Walker started toward Barron, and Barron struck him with the lash of a whip. Walker still advancing, Barron seized a pistol then lying on the wagon seat, covered Walker with it, and ordered him to leave. He left (Steuhler going with him) with the remark, coupled with an oath, that if he could ever get Barron away from his family he would kill him. About this time old man Walker arrived, and Barron covered him with the pistol and ordered him to halt. Walker said that he had come for peace. Barron replied that he wanted peace, and the two took a seat on a large stone and proceeded to talk over the trouble about the land. Barron said that if the land was not his he would willingly surrender it, and that all he wanted was to get the title fairly decided by the courts. Mr. Walker replied that the boys would not test it in court. On another occasion, while the witness and her younger daughter were in the field, her daughter Mary went to the spring. When witness returned, she found Mary crying, and learned from her that she met Mrs. Walker and Miss Lou Walker at the spring; that Miss Lou jumped on and shook her, while Mrs. Walker held a switch with which she threatened to whip her. Soon afterward witness saw old man and old lady Walker, and, speaking to them, said: "That is just like you Walkers. Two or three of you catch one of us out alone and abuse us. Mr. Walker, I thought you too much a gentleman to stand by and see two great women jump on and abuse one poor little girl; but I suppose you stood by and saw it well done." Mr. Walker replied: "You are a liar; I was not there." Mrs. Walker then cursed and abused witness, and she and the old man advanced upon witness. Both of them stopped at the fence, and witness said to Mrs. Walker that she reminded witness of an impudent old negro. Thereupon Mr. and Mrs. Walker crossed the fence, the latter seized a stone in each hand, cursed the witness and threatened to beat her to death. Witness then went into her house, got an old pistol, and said that she would defend herself if she could. As the Walkers turned back, the old lady said that she would get a gun.

On another occasion John Walker came to witness's house while Mr. Landrum was there. William Walker was then at the spring branch, cursing Mr. Barron. John asked Mr. Barron

if he knew why Bill was mad with him. Barron replied that he did not, and did not care. John said then that Bill was mad about what had been said by the Barron women about his sister. Barron replied that he knew nothing about it, and did not allow his people to talk about other people. Mr. Landrum then remarked that the Barrons and Walkers, living so near together, should live as neighbors and at peace. In reply, Barron said that he had been trying to live in peace. Walker said: "We don't want peace yet awhile." He then went home. The witness testified that, on another occasion, John Walker got a gun, and from his yard pointed the same towards Barron's house and snapped it several times, cursing Barron during the time. On another occasion, old man Tunnel and his son James went to Barron's field to get some rock. Old man Walker went to them and ordered them not to interfere with the rock. Witness told him that he had no right to interfere; that Mr. Tunnel had Barron's permission to take the rock, and that Barron owned it. Old man Walker thereupon cursed witness and denounced her as a liar. Hugh was not squatting behind the fence just before he shot and killed old man Walker. He took his position in the yard, standing, before his father began to shoot, and stood there until old man Walker struck him with a rock, when he fired with fatal effect.

This witness was subjected to a very rigid cross examination by the State, but it did not result in producing any appreciable change in her testimony in chief, nor in developing any additional fact of importance.

Miss Mary Barron, the daughter of the last witness, testified almost circumstantially and in detail as her mother did as to the occurrences at the time of the killing, and as to what occurred at the time of the difficulty between the Walkers and her mother, which arose over the shaking inflicted upon witness at the spring by Miss Lou Walker, and as to the circumstances of the difficulty between John and William Walker and her father on the occasion when Mr. Landrum was there. She had no personal knowledge of the other difficulties between the Walkers and Mr. Barron.

Rev. A. K. Landrum testified, for the defense, that once while visiting at Mr. Barron's, he heard a voice at the spring cursing Barron. Presently, John Walker came to Barron's house, and asked Barron if he knew what the man at the spring was mad about. Barron replied that he did not. John said that it was

something about the women. Witness then remarked that parties living so near together ought to live peaceably and friendly. John Walker replied that they did not want peace, and left. Barron was a member of witness's church. Witness had never heard him swear.

Thomas Smith, the next witness for the defense, testified that Mr. W. F. Barron and his son Hugh came to his house on the evening of and after the killing of Walker, and told him the circumstances of the tragedy. Mr. Barron asked witness to advise him what to do. Witness advised him to surrender; that if he acted right his trial would result in his exoneration, and that if he acted wrong he ought to suffer the penalty of his wrong doing. The two Barrons had long sustained the reputation of being law abiding, peaceable citizens.

Deputy Sheriff Jenkins, of Blanco county, Texas, testified for the defense, that old man Barron and his son Hugh came to his house about ten o'clock on the night of the killing, reported what they had done, and surrendered themselves and their arms.

Three different witnesses testified, for the defense, that they examined Barron's premises on the morning after the killing. In the yard they found three small cartridge hulls, and two large ones. They also found several stones; some smaller, some as large and some larger than a man's fist. The yard was otherwise cleanly and neatly kept, and the witness thought the stones had been recently thrown or placed there. Each of the witnesses heard William Walker, on the day after the killing, say that he, and not the Barrons, was to blame for the killing of old man Walker, and that, had he been sober, the fight would not have taken place. He said nothing about the throwing of rocks, or the efforts of old man Walker to preserve the peace. Each of the said witnesses testified to the good characters of the Barrons as peaceable, law abiding citizens.

Justice of the Peace Bebee testified, for the defense, that in the fall of 1884, old man Barron applied to him for a peace warrant against the Walkers, with whom he said he could not live in peace. Witness ascertained that real estate troubles was the casus belli, and advised him to go to the sheriff.

Sheriff Jackson, of Blanco county, testified, for the defense, that at the request of Mr. Barron, he saw old man Walker and appealed to him to come to an amicable settlement of his difficulty with Barron, or permit the law to settle it in a legal man-

ner. Old man Walker became furious; declined to talk of such settlement, and said that he and the Barrons could not live in the same community; that he or Barron had either to leave or be hauled off in a wagon. Witness never reported this conversation to Barron.

Ed. Smith testified, for the defense, that in 1884, he heard some one ask Bill Walker why he did not settle his land dispute with Barron in the court house, and avoid possible trouble. Bill replied: "Oh! God d—n old Barron, he won't fight; he is too big a coward. I cursed him several times, and he drew his pistol on me once, but he won't shoot. I intend to keep after him until I run him off the land. I am too poor to go to law about it." About a year later witness heard Will Walker say that he was not going to fool with the land any longer, but was going to abandon it.

The defense closed.

John Walker was introduced by the State in rebuttal. He denied Mrs. Barron's statement on the stand that either he or his father, the deceased, threw any stones at the time of the killing; admitted that his brother William threw some, but declared that he threw the first one after Barron opened fire on him. Mrs. Barron, he declared, did throw stones, while her husband and son were shooting.

Cross examined, the witness admitted that on one occasion he, his brother William and the two Bundick boys, went to Barron's field, and he and William cursed Mr. Barron, and threatened to whip him if he would come out of the field. Barron did not curse on that occasion. Witness's difficulty with Hugh Barron, spoken of by a previous witness, was brought about by Hugh singing the vulgar song entitled "The key hole in the door," in the hearing of witness's mother and sister, who went into the house to keep from hearing it. Witness's mother was mistaken about the witness singing "Whoop 'em up, Hugh" on that occasion. Witness seized a club and threatened Hugh with it. The club was taken from him by his mother and sister. Witness knew only by hearsay about his pointing a gun at Barron's house, and cursing on one occasion. He was too drunk that day to know what happened. The witness's narrative about what transpired at the quarrel in the presence of Mr. Landrum was a substantial corroboration of the previous witnesses, except that witness did not remember saying that he did not want peace. Witness and his brother had cursed and abused the Bar-

rons so much that they had become convinced that the Barrons would not fight, and did not expect them to fight when they went towards their house on the fatal day. Witness had no recollection of telling A. L. Gray, on the day of the killing, that the killing was all on one side because the Walkers fought with stones and the Barrons with fire arms. Gray, when placed upon the stand, disputed this statement of the witness, and declared that the latter did make it.

Harrison Lewis testified, for the State in rebuttal, that he was in Barron's yard very early on the morning after the killing, and say only two loose rocks in that yard. He looked carefully, but unsuccessfully for others.

The motion for new trial raised the questions discussed in the opinion.

No brief for the appellant has reached the Reporters.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Appellant and his father, W. F. Barron, were jointly indicted and jointly tried for the murder of W. W. Walker. The trial resulted in the acquittal of W. F. Barron, the father, and the conviction of this appellant of manslaughter, with punishment affixed at two years in the penitentiary.

At the trial, the State, over objection of this appellant, was permitted to introduce evidence of threats made by W. F. Barron against deceased and other members of his family, when this defendant was not present. When appellant's objection to this evidence was overruled, the court promised to limit and control the same as to this appellant in the charge to the jury. This was not done, and the failure to do so is manifest error.

Two special instructions requested for appellant were refused by the court, because, as stated, they were substantially embraced in the general charge. This may be so with reference to the first of these instructions, but we do not think that the phase of the case, as presented in the second, is to be found in the general charge; and, if so, it certainly is not presented in as plain, forcible, pertinent and affirmative a manner as in said second instruction, which reads as follows: "Although the deceased, W. W. Walker, may have intended no violence to the defendants, yet, if at the time he was killed he was approaching the defendants in company with his sons, and they, his sons, were

making an unlawful and violent attack upon defendants or either of them, such as produced in their minds a reasonable apprehension that the lives of them or either of them, was endangered by such attack, or that thereby serious bodily injury was about to be inflicted upon them or either of them, and defendants or either of them fired upon deceased, W. W. Walker, and killed him, not knowing his innocent intention, but believing he was acting and participating with his sons in such unlawful and violent attack, then such killing would be justifiable, and the party or parties doing such killing would not be guilty of any offense."

The proposition embraced in his instruction was made most important by certain testimony adduced by the State, going to show that deceased, when killed, had gone to the place where he was killed to prevent or stop the difficulty between his sons and the Barrons, and that, at the instant he was shot, his hands were elevated in front towards the Barrons, as if imploring them to desist from the shooting. It was error to decline and refuse to give this instruction in charge to the jury, in view of the facts in the case.

Several interesting questions are made in the record with regard to the special *venire*; and one of the grounds of the motion for new trial was to enable this appellant to have the testimony of W. F. Barron, his codefendant, whose testimony could not be had upon this trial, but who, having been acquitted, could testify on another trial to facts most material to this defendant. (Helm v. The State, 20 Texas Ct. App., 41.) These questions it is unnecessary for us to discuss, for they can not arise upon another trial. For the errors we have above pointed out, the judgment is reversed, and the cause is remanded.

*Reversed and remanded.*